# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**TAHRIR SHAKIR KALASHO, et al.,**

    Plaintiffs,  Civil Action No. 06-11030

vs.  HONORABLE NANCY G. EDMUNDS
    U.S. DISTRICT JUDGE
**REPUBLIC OF IRAQ, et al.,**

    HONORABLE R. STEVEN WHALEN
    Defendants.  U.S. MAGISTRATE JUDGE

_____/

## REPORT AND RECOMMENDATION

Plaintiffs have filed a Complaint pursuant to the Foreign Sovereign Immunity Act (FSIA), 28U.S.C. §§1605(a)(5) and (7), alleging injuries sustained from Defendants' noncommercial torts and acts of torture. The Defendants are the Republic of Iraq, former President Saddam Hussein[1], the Ba'ath Socialist Party, and other officials and/or representatives of pre-invasion Iraq.[2] Before the Court is Plaintiffs' Motion for Judgment by Default [Docket #44], which has been referred for a Report and Recommendation under 28 U.S.C. § 636(b)(1). I recommend that the Motion be GRANTED IN PART AND DENIED IN PART, as discussed below.

### I. PLAINTIFFS' ALLEGATIONS

The Plaintiffs allege that on or about October, 1981, through 1997, the Defendants

---

[1] Plaintiffs have filed a Suggestion of Death as to Saddam Hussein [Docket #45].

[2] These Defendants are: Taha Muhyi Tal-Din Maruf, Taha Yahin Ramadan, Tariz Mikhayal Aziz, Sa'Sun Ghaydan, Adnan Kharallah, Sa'Dun Hammadi and Hamid Alwan, and 10 "John Doe" defendants

committed unlawful tortious acts and acts of violence and torture on them.³ Tahrir Kalasho claims that in 1981, he was invited to a gathering in Livonia, Michigan, that was hosted by the State of Iraq and the ruling Ba'ath Party. After he arrived, he learned that the gathering was not for prospective business opportunities, but instead to recruit Christian American Iraqis to become members of the Ba'ath Socialist Party and praise and sacrifice their lives for Saddam Hussein. Plaintiff asserts that he refused to join or to follow specific orders given by the Baath Party representatives.⁴ Because of his refusal, the Defendants allegedly began to commit tortious and torturous acts on Tahrir Kalasho in order to kill him.

Plaintiff claims that on the same day as the meeting in 1981, he was attacked by ten to fifteen Ba'ath agents, where they used deadly weapons to strike him repeatedly on his head, back, face, chest, legs and arms. As a result, he sustained severe injuries. Further, he claims that he was tied up and taken to a black van. He states that he eventually escaped from the van with the help of another member of the Ba'ath Party, and was rushed to a local hospital.

Tahrir Kalasho alleges that during the course of the next 16 years or so, the Defendants tried numerous times to assassinate him because he continually refused to join Saddam Hussein's political regime. Such attempts occurred in the State of Michigan and included firing bullets at him and his son on different occasions: (1) while he was at a coffee shop in December of 1981; (2) while he was walking up to his parked car on Eight Mile

---

³The alleged torts and torturous acts committed on Shakhir Kalasho obviously did not commence until he was born in the middle of 1996.

⁴Such orders were to dance, sing, clap, applaud, offer to be a sacrifice and praise and celebrate in accordance with the song. The lyrics of the song included "We praise you Saddam, we give our life for you Saddam, our Saddam is precious, we risk our life for you Saddam as a sacrifice, we sacrifice our life for your safety and protection, because our Saddam is so precious." (*Complaint* at p. 7).

Road in January of 1982; (3) while he was pumping gas in the summer of 1982; (4) while he was exiting the family business located on Moffet and Rohns Streets in the end of 1984; (5) while he was leaving a coffee shop in early 1985; (6) while he was at his home in Madison Heights around the fall of 1985; (7) while entering a restaurant on Seven Mile Road around the fall of 1986; (8) while at his residence in the beginning of 1988; (9) while at the family business in the fall of 1992; (10) while at his residence in the beginning of 1993; (11) while at his residence in the end of 1993; and finally, (12) while at his residence with his son in the fall of 1996. Further, Plaintiff claims that his house and business were firebombed on several different occasions by the defendants throughout the sixteen-year period.

## II.　LEGAL PRINCIPLES UNDER THE FSIA

The FSIA provides the sole basis for asserting jurisdiction over a foreign state in the United States. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The FSIA presumes that a foreign state is immune from suit unless one of the enumerated exceptions in the Act apply. *Id.*; *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101, 1105 (D.C. Cir. 2001). The seven statutory exceptions are set forth in 28 U.S.C. § 1605, and, pertinent to the present case,[5] include any case:

> "(5)...in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any

---

[5] In their complaint, the Plaintiffs have asserted other claims which clearly fall outside the scope of § 1605, including alleged violations of 42 U.S.C. §§1981 and 1985; 42 U.S.C 10602(b)(1); the Universal of Declaration of Human Rights, International Laws, Articles I through XIII, XVIII, XIX, XX, and XXX and also the articles that were adopted by General Assembly Resolution 3452 (XXX) of 9 December 1975, which are Articles I(1)(2), through XI; and state tort claims under M.C.L. §§ 691.1407(2)(c), 691.1408, and 691.1413 . Because the FSIA provides the sole basis of subject matter jurisdiction, *Argentine Republic v. Amerada*, Plaintiffs are not entitled to default judgment on those claims, which are not properly before the Court.

official or employee of that foreign state while acting within the scope of his office or employment...

(7)...in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources..."

For purposes of § 1605, a "foreign state" includes an "agency or instrumentality of a foreign state." *See* 28 U.S.C. § 1603(a). In turn, under § 1603(b), "agency or instrumentality" includes any entity:

"(b)(1) which is a separate legal person, corporation or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest if owned by a foreign state or political subdivisions thereof, and

(3) which is neither a citizen of a State of the United States as defined in Section 1332(c) and (d) of this title, nor created under the laws of any third country.

This definition is to be construed broadly. *See Fabe v. Aneco Reinsurance Underwriting Limited*, 784 F. Supp. 448, 450 (S.D.Ohio 1991). Further, "[t]he FSIA has been construed to apply to individuals for acts performed in their official capacity on behalf of either a foreign state or its agency or instrumentality." *Weinstein v Islamic Republic of Iran*, 184 F.Supp.2d 13, 21 (D.C. D.C. 2002) (quoting *El-Fadl v Central Bank of Jordan*, 75 F.3d 668, 671 (D.C.Cir. 1996) (citations omitted)).

Thus, subject matter jurisdiction is determined under § 1605 of the FSIA. In terms of personal jurisdiction, 28 U.S.C. § 1608 sets forth two separate procedures for service of process on either a foreign state itself, or on an agency or instrumentality of a foreign state. The exclusive procedures for effecting service of process upon a foreign state itself are set forth in § 1608(a), which establishes four methods of service. "The provisions for service under section 1608 are hierarchical, such that a plaintiff must attempt the methods of service

in the order they are laid out in the statute." *Magness v. Russian Federation,* 247 F.3d 609, 612 (5th Cir. 2001)(citations omitted).  The methods of service on a foreign state under §1608(a) are:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement . . .between [the parties], or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with applicable international convention on service of judicial documents, or
>
> (3) [if not (1) or (2), then] by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
>
> *(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services–and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted."* (Emphasis added).

The exclusive methods for service on an agency or instrumentality of a foreign state are set forth in § 1608(b), and include:

> (b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state
>
> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement between [the parties], or
>
> (2) if no special arrangements exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment . . . to receive service . . . or in accordance with applicable international convention on service of judicial documents, or
>
> (3) *if [not (1) or (2)], and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state . . . (B) by any form of*

*mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served* . (Emphasis added).

Under the FSIA, subject matter jurisdiction under § 1605, coupled with proper service of process under § 1608, establishes personal jurisdiction. 28 U.S.C. § 1330(b)[6]; *Alberti v. Empresa Nicaraguense de la Carne*, 705 F.2d 250, 252-253 (7th Cir. 1983).

### III.  ANALYSIS

The Plaintiffs' motion for default judgment must be assessed under the strict statutory requirements of the FSIA.[7]  With respect to each Defendant, the Court must answer these questions:

(1) Is the Defendant either a foreign state or the agency or instrumentality of a foreign state, as those terms are defined in § 1603?

(2) If so, do one or more of the statutory exceptions to sovereign immunity, contained in §1605, apply?

(3) If the Defendant does not have sovereign immunity, was service of process properly effected under § 1608?

#### A.  Defendants' Status as "Foreign State" Under § 1603

The Republic of Iraq under the Saddam Hussein regime was clearly a foreign state, as is the successor, post-invasion Republic of Iraq.  An initial question is whether, for purposes of the FSIA and potential liability, the current Republic of Iraq that was purportedly served in this case is the same "foreign state" against whom Plaintiffs bring their claims,

---

[6] § 1330(b) states, "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title."

[7] The Plaintiffs' allegations are assumed to be true for purposes of determining if they are sufficient to deprive Iraq, its agents, or its instrumentalities of sovereign immunity. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

notwithstanding the regime change. Under established principles of international law, it is.

There is a clear distinction between a successor *state* and a successor *government.* "Under international law, the capacities, rights, and duties set forth in §206 appertain to the state, not to the government which represents it. When the state ceases to exist, its capacities, rights, and duties terminate. They are not affected by a mere change in the regime or in the form of government or its ideology." *Restatement (Third) of Foreign Relations Law of the United States,* §208(a).[8] *See also Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 731 F.Supp. 619, 621 (S.D.N.Y.1990), *aff'd,* 925 F.2d 566 (2d Cir.1991) ("International law sharply distinguishes the succession of state, which may create a discontinuity of statehood, from a succession of government, which leaves statehood unaffected"); *Yucyco, Ltd. V. Republic of Slovenia*, 984 F.Supp. 209, 217 (S.D.N.Y. 1997). In *Jackson v. People's Republic of China,* 550 F.Supp. 869, 872 (D.C.Ala.,1982), the court held that the People's Republic of China responsible for the obligations of the pre-revolutionary Imperial government:

> "It is an established principle of international law that '[c]hanges in the government or the internal policy of a state do not as a rule affect its position in international law. A monarchy may be transformed into a republic, or a republic into a monarchy; absolute principles may be substituted for constitutional, or the reverse; but, though the government changes, the nation

---

[8] The "capacities, rights, and duties" of a state are described as follows in §206 of the *Restatement*:

Under international law, a state has:
1. (a) sovereignty over its territory and general authority over its nationals;
   (b) status as a legal person, with capacity to own, acquire, and transfer property, to make contracts and enter into international agreements, to become a member of international organizations, *and to pursue, and be subject to, legal remedies*;
   (c) capacity to join with other states to make international law, as customary law or by international agreement. (Emphasis added).

remains, with rights and obligations unimpaired.' *Lehigh Valley R. Co. v. State of Russia,* 21 F.2d 396, 401 (2d Cir.1927) (quoting Moore, Digest International Law, vol. 1, p. 249). The People's Republic of China is the successor government to the Imperial Chinese Government and, therefore, the successor to its obligations."

Following the American invasion of Iraq in March of 2003, a Coalition Provisional Authority was placed in power to govern the country. On June 28, 2004, sovereignty was transferred to the Iraqi Interim Government, and on January 30, 2005, the same date elections were held to choose representatives for the newly formed Iraqi National Assembly, power was transferred to the Iraqi Transitional Government. On April 7, 2005, the Assembly chose Jalal Talabani as President of State.[9] The Constitution of Iraq was ratified on October 15, 2005, and the permanent Iraqi government was installed on May 20, 2006. Yet throughout these incremental changes in power from Saddam's Ba'athist regime to the current government, Iraq has maintained its status as a state, or nation. Its territorial integrity is intact, and those who were citizens of Iraq before the 2003 invasion are still citizens of Iraq. There has been no discontinuity of statehood.

Accordingly, under §1603, the Republic of Iraq, as it is currently ruled by its successor government, is the "foreign state" that is subject to this lawsuit and to the FSIA.

The formerly ruling Ba'ath Socialist Party fits the definition of an agency or instrumentality of a foreign state, under §1603(b).[10] Further, assuming that the remainder of the Defendants were authorized by the state to perform the types of acts alleged, they also

---

[9] Under the new Iraqi Constitution, the president is the head of state, but the prime minister (currently Nouri al-Maliki) is the active executive authority.

[10] The Plaintiffs allege that the Ba'ath Party is a". . .corporation who [sic] is a division of the Republic of Iraq (State), who is in control, command and regulations [sic] of the government and the laws of the Republic of Iraq (State), and is responsible for the acts of its employees, agents, servants, representatives, and their delegates." *Complaint* at 3.

fall within the broad definition of a foreign state.[11]  Therefore, the Defendants are presumed to be protected by sovereign immunity unless they come within one of the exceptions of §1605.

### B.  Subject Matter Jurisdiction Under § 1605

#### 1. Noncommercial Torts Under § 1605(a)(5)

By its terms, §1605(a)(5) removes immunity where noncommercial injury (i.e., personal injury or damage or loss of property) (1) occurs in the United States, and (2) is "caused by the tortious act or omission [of the Defendant] while acting within the scope of his office or employment."  In *Argentine Republic v. Amerada Hess Shipping Corp.*, *supra*, at 439-440, the Supreme Court noted that "Congress' primary purpose in enacting §1605(a)(5) was to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law."  However, §(5)(A) states that the non-commercial tort exception does not apply where the claim is based "upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  Thus, "[t]he tort exception has exceptions itself. . . . [and] extends immunity if the tort occurs during the performance of a discretionary function."  *Alicog v. Kingdom of Saudi Arabia,* 860 F.Supp. 379, 382 (S.D.Tex,1994).

The Plaintiffs have alleged that all the acts by the Defendants occurred in the State of Michigan, and that the acts occurred while each Defendants was acting within the scope of his office.  Thus, the only question to be resolved is whether or not the acts were

---

[11]The Plaintiffs assert that Defendants  Saddam Hussein, Taha Muhyi Tal-Din Ma'ruf, Taha Yahin Ramadam, Tariq Mikhayl Aziz, Sa'dun Ghaydan, Adnan Kharallah, Sa'dun Hammadi, Hamid Alwan, and John Doe I through X, individually and/or in their representative capacity, were agents, delegates, representatives, servants, and employees of the Defendant Republic of Iraq.  *See Complaint* at 3.

discretionary. The test for determining whether an act is discretionary is "whether there was a choice of conduct that was grounded in social, economical, or political policy." *Alicog,* 860 F.Supp. at 382. Discretionary functions are limited to legitimate diplomatic functions. *Id.* at 383. Serious criminal acts fall outside the scope of a discretionary function. "Kidnaping, private imprisonment, and assassination are all beyond the scope of legitimate diplomatic operations not protected by the discretionary function exception, and courts have jurisdiction over a government committing those acts." *Id.*

Here, Plaintiffs allege that the Defendants have committed serious criminal acts, including attempted murder, assault and battery, kidnaping, and arson, to name of few. These are not discretionary functions for which the Defendants would retain immunity. Therefore, under §1605(a)(5), the Court has subject matter jurisdiction with regard to the alleged non-commercial torts.

### 2. Acts of Torture Under §1605(a)(7)

In §1605(a)(7), Congress created a remedy for American citizens who are victims of acts of torture and hostage-taking committed by foreign states that have specifically been designated by the State Department as "state sponsors of terrorism." *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88-89 (D.C. Cir. 2002); *Weinstein v. Islamic Republic of Iran, supra*, 184 F.Supp.2d at 21. The essential elements of a claim under §(a)(7) were described as follows in *Weinstein*:

> "A foreign state may be liable under the FSIA when there is injury from a terrorist act, that act was perpetrated by the designated state or an agent receiving material support from the designated state, the provision of support was an act authorized by the foreign state, the foreign state has been designated as one providing material support to terrorism, either the victim or the plaintiff was a United States national at the time of the terrorist act, and similar conduct by the United States, its agents, officials or employees within the United States would be actionable." 184 F.Supp.2d at 21.

All of these elements have been pled in the present case. Iraq was designated a state

sponsor of terrorism on September 1, 1990. *See Hill v. Republic of Iraq,* 175 F.Supp.2d 36, 46 (D.C. D.C. 2001). The acts were alleged to have been perpetrated by agents of Iraq, Saddam Hussein and the Ba'ath Party. Plaintiffs are United States citizens. Furthermore, the acts, which would be actionable against U.S. agents or employees, appear to fit the definition of "torture" as used in the FSIA.[12]

The published cases involving §(a)(7) typically involve acts of terrorism which occur outside the United States. *See, e.g., Weinstein* (American citizen killed in terrorist suicide bombing on an Israeli passenger bus); *Price* (American citizens detained and subjected to deplorable conditions in a Libyan prison). Indeed, the legislative history shows a Congressional concern that, prior to the 1996 amendment to the FSIA which added § (a)(7), terrorism, torture, and hostage-taking committed abroad were immunized forms of state activity. *Price, supra, 294 F.3d at 88. See also* H.R. Rep. No. 103-702, at 4 (1994)("[T]he FSIA does not currently allow U.S. citizens to sue for gross human rights violations committed by a foreign sovereign *on its own soil*")(emphasis added). However, nothing in the language of §(a)(7) limits its reach to only extraterritorial acts. Therefore, even though all of the Defendants' acts in the present case are alleged to have occurred in Michigan, they are covered by §(a)(7).

---

[12] Pursuant to 28 U.S.C. § 1605(e), the definition of torture is derived from the Torture Victim Protection Act of 1991 (TVPA), 28 U.S.C. § 1350:

> "any act, directed against an individual in the offender's custody, by which severe pain or suffering (other than pain and suffering arising only from or inherent in, or incidental to, lawful sanctions, whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind."

Accordingly, this Court has subject matter jurisdiction regarding Plaintiff's allegations of torture under 28 U.S.C. §1605(a)(7), as well as regarding non-commercial torts under §1605(a)(5).

### C. Personal Jurisdiction / Service of Process

Service of process on a foreign state is governed by the provisions of 28 U.S.C. §1608(a); service on an agent or instrumentality of a foreign state by §1608(b). In the present case, therefore, service on the Republic of Iraq will be analyzed under subsection (a), and service on all other Defendants will be examined under subsection (b).

#### 1. Service on Republic of Iraq

§ 1608(a) sets forth "*the exclusive procedures* for service on a foreign state." *Magness v. Russian Federation, supra*, 247 F.3d at 615 (quoting H.R. Rep. No. 94-1487, at 24 (1976)(emphasis in original). As such, it requires strict compliance. *Id.*; *Alberti v. Empresa Nicaraguense de la Carne, supra*, 705 F.2d at 250; *Gray v. Permanent Mission of People's Republic of Congo to United Nations*, 443 F.Supp. 816, 821 (S.D.N.Y.), *aff'd* 580 F.2d 1044 (2d Cir. 1978)(absent strict compliance, service is improper even where defendant receives actual notice).

In this case, the Plaintiff properly served the Republic of Iraq pursuant to §1608(a)(4):

> "(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services–and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted."

Docket Entry #17 is a letter from the United States Department of State, filed with the Clerk of the Court, certifying that the Complaint, Summons and Notice of Suit were served

through diplomatic channels on the Ministry of Foreign Affairs of the Republic of Iraq, pursuant to §1608(a)(4):

> "I am writing regarding the transmittal of a summons, complaint, and notice of suit to the Republic of Iraq pursuant to 28 U.S.C. Section 1608(a)(4) as a defendant in the above referenced case.
>
> "The American Embassy in Baghdad, Iraq transmitted the summons, complaint, and notice of suit to the Ministry of Foreign Affairs of the Republic of Iraq on August 10, 2006 under cover of diplomatic note No. 276 dated August 3, 2006. A certified copy of the Embassy's diplomatic note, and a copy of the documents transmitted to the foreign ministry are enclosed herewith in accordance with the procedures established for the implementation of the Foreign Sovereign Immunities Act."

The diplomatic note, a certified copy of which is attached to the letter, clearly sets forth the requirement that the Defendant file a responsive pleading within 60 days of the transmittal of the Complaint "or face the possibility of having judgment entered against it without the opportunity of presenting evidence or arguments in its behalf." The documents were transmitted on August 10, 2006.

Accordingly, Defendant Republic of Iraq has been properly served under §1608(a)(4).

## 2. Service on Individual Defendants

The adequacy of service on the other nine named Defendants is governed by §§1608(b)(2) and (3), the procedures under which Plaintiffs attempted service. Unlike § (a)(3), substantial compliance, as opposed to strict compliance, will suffice. *Sherer v. Construcciones Aeronauticas, S.A.*, 987 F.2d 1246, 1250 (6th Cir. 1993). However, to meet the substantial compliance test, technically defective service must result in actual notice to the defendant:

> "'[T]he better rule permits the assertion of personal jurisdiction where substantial compliance has effected actual notice. The purpose of the Act's requirements is to ensure actual notice to foreign states of the fact and substance of pending litigation. Where a party has received such notice, despite technical omissions in the manner of service, the purpose of the Act if not its letter has been satisfied.'" *Id.* At 1250 (quoting *Obenchain Corp. v. Corporation Nacionale de Inversiones*, 656 F.Supp. 435, 437 (W.D. Pa. 1987), *aff'd in part* 898 F.2d 142 (3rd Cir. 1990).

The Certificates of Service regarding the individual Defendants are filed in Docket

Nos. 5 through 13. Each Certificate contains Tahrir Kalasho's affidavit stating that service was effected under §1608(b)(2) by sending the Summons, Complaint and Notice of Suit by certified mail "to Defendant's lawfully authorized and assigned General Agent" on June 2, 2006. The return receipts, however, show that for each Defendant, the documents were mailed to "Iraqi Interest Section, 1801 P Street, Washington, D.C. 20036." Section (b)(2) requires service "by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment . . . to receive service."

The "Iraqi Interests Section" in Washington does not qualify as an "agent authorized to receive service." Prior the time of attempted service, the Iraqi Interests Section was the diplomatic liaison for the interim Iraqi government after the overthrow of Saddam Hussein. It was housed at, and operated under the protection of the Algerian embassy at 1801 P Street. By the time of attempted service, the current Iraqi government had assumed power, and an Iraqi embassy had opened in Washington. In any event, at the time of service, the Iraqi Interests Section could in no way be considered to be the agent of officials of the former regime. Thus, service was improper under §1608(b)(2).

Nor would service on the Iraqi Interests Section at the Algerian embassy be "reasonably calculated to give actual notice," as required by § (b)(3). Finally, since there has been no showing that any of the Defendants received actual notice of the suit, Plaintiffs have not substantially complied with the statute. The individual Defendants have not been properly served under the FSIA.

### D.    DEFAULT JUDGMENT

As to Defendant Republic of Iraq, the Plaintiffs have demonstrated both subject matter jurisdiction under 28 U.S.C. §§ 1605(a)(5) and (a)(7), and proper service of process under 28 U.S.C. §1608(a)(4). Far more than 60 days have elapsed since service was effected on August 10, 2006, and this Defendant has not answered or otherwise responded to the Complaint. The Clerk's Office entered the Defendant's default on November 28, 2006, pursuant to Fed.R.Civ.P. 55(a) [Docket

#39]. The Plaintiffs have now moved for a default judgment pursuant under Rule 55(b)(2), which provides, in pertinent part:

> "[T]he party entitled to judgment by default shall apply to the court therefore;...If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper ...."

Entry of default judgment under Rule 55(b)(2) is entrusted to the court's discretion. Wright, Miller & Kane, *Federal Practice and Procedure* § 2685 (1998). Further, "Rule 55(b)(2) empowers the district judge to hold hearings or 'order such references as it deems necessary and proper' to aid its exercise of this discretion." *Id.* at § 2684. In this case, Plaintiffs should be granted a default judgment against the Republic of Iraq, but because the measure of damages is uncertain, it is necessary to conduct a Rule 55(b)(2) hearing.

As to the remaining Defendants, Plaintiff has not shown proper service under the FSIA, and is therefore not entitled to a default judgment.

## IV. CONCLUSION

For the foregoing reasons, I recommend that Plaintiff's Motion for Judgment of Default [Docket #44] be GRANTED as to Defendant Republic of Iraq, and that an evidentiary hearing be scheduled pursuant to Rule 55(b)(2), to determine the amount of damages.

I further recommend that as to all other Defendants, the Motion for Judgment of Default be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with

specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: July 25, 2007

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 25, 2007.

s/Susan Jefferson
Case Manager